UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:21-00129 (WOB-CJS)

KERRI AUSTIN,

                                                    PLAINTIFF,

VS.                          MEMORANDUM OPINION AND ORDER

THE STANDARD FIRE
INSURANCE COMPANY,

                                                    DEFENDANT.

Before the Court are three motions filed by Standard Fire:

(1)   A motion for summary judgment (Doc. 44);

(2)   A motion to exclude Austin's expert witness, Jim Leatzow
      (Doc. 45); and

(3)   A  motion  to  strike  the  affidavit  of  Austin's
      psychologist, Peter Ganshirt (Doc. 67).

For the following reasons, the motion for summary judgment will be
denied, the motion to exclude will be granted in part and denied
in part, and the motion to strike will be denied as moot.

### *Factual and Procedural History*

On a clear night in September 2020, 21-year-old Kerri Austin
was driving south down U.S. Highway 42, on her way home from
Kroger. (Doc. 1-1 at 8-9; Doc. 44-3, Austin Dep. at 70:12-15).
Traveling north was Manford Stewart, returning home from the
Florence Speedway. (Doc. 1-1 at 12-13). Stewart had been drinking.

(*Id.*). He crossed over the center line into the southbound lane and collided with Austin. (*Id.* at 9, 12).

First responders arrived two minutes after the accident. (*Id.* at 8). The fire department had to extricate Austin from her car, and she was airlifted to the University of Cincinnati Medical Center. (*Id.* at 12). At first, Stewart wouldn't speak to the police. (*Id.* at 9). He didn't submit to a preliminary breath test or a field sobriety test. (*Id.*). The officer questioning Stewart told his supervisor that Stewart smelled of alcohol, and there were several Bud Light cans in Stewart's Jeep. (*Id.*).

Eventually, Stewart told the police that he was on the way home from Florence Speedway, and he thought Austin had crossed into his lane. (*Id.* at 12–13). Stewart was also taken to UC Medical Center. (*Id.* at 13). The police sought a warrant to collect a blood sample, which was granted. (*Id.*). They executed the warrant and took a sample, which revealed a blood alcohol level of .21. (*Id.*).

Austin was discharged from the hospital the day after the accident. (Doc. 44-3, Austin Dep. at 84:20–21). A couple of days later, Austin's mother contacted Standard Fire to report the accident. (Doc. 44-4 at 56). She and Austin spoke to a personal injury protection (PIP) adjuster, who noted that Austin's injuries included a concussion, torn abdominal muscle, and multiple lacerations and bruises. (*Id.* at 55). The PIP adjuster approved the claim for payment. (*Id.* at 57). One month later, the PIP

2

adjuster noted that the coverage was exhausted and she was closing the PIP file. (*Id.* at 64).

Austin then sued Stewart for her personal injuries from the accident. (*Id.* at 16:17-20). Stewart was also insured by Standard Fire. (Doc. 44-5, Wong Dep. at 68:18-21). Austin had two claims: a personal injury claim against Stewart, and an underinsured motorist claim against Standard Fire. (Doc. 44-4, Austin Dep. at 17:9-16). She settled the personal injury claim against Stewart for $100,000, the coverage limit under Stewart's policy. (*Id.* at 17:9-12).

That left Austin's underinsured motorist claim against Standard Fire. Austin issued a demand for the $100,000 policy limit on that claim. (Doc. 44-9, Shockling Dep. at 65:2-4). Standard Fire's procedure was for adjusters to notify their unit managers whenever a claimant demanded a policy limit. (*Id.* at 65:5-8). The adjuster assigned to Austin's claim lacked authority to issue a $100,000 policy limit payment; she could set a reserve, but the actual payment had to be approved by her unit manager. (*Id.* at 65:15-22).

At first, the adjuster couldn't complete her evaluation of Austin's claim because certain bills were missing, and because some of the electronic medical records from UC Medical Center couldn't be opened. (*Id.* at 66:8-22). Austin's attorney agreed to

place the demand on hold while he gathered the missing information. (*Id.* at 67:1-3).

Once that information was available, the adjuster finished evaluating Austin's claim. (*Id.* at 68:1-9). After accounting for special and general damages, she valued the claim at $20,000 and offered $12,500 to settle. (Doc. 44-5 at 78; Doc. 44-9 at 70:19-24). Austin's attorney rejected the offer and submitted another medical report that discussed some of the neurological consequences of Austin's accident. (Doc. 44-9 at 72:22-75:15). After considering that report, the adjuster increased her valuation of the claim to $35,000 and offered $20,000 to settle. (Doc. 44-5 at 88). Austin's attorney rejected that offer too.

Austin sued in September 2021, and Standard Fire removed. (Doc. 1). Standard Fire assigned a new adjuster to Austin's claim. (Doc. 44-5, Wong Dep. at 46:8-10). The new adjuster kept the same evaluation as the prior adjuster. (*Id.* at 53:2-7). However, the neurology report piqued the new adjuster's interest and prompted him to request more medical records in order to establish a baseline for what Austin's health looked like before the accident. (*Id.* at 83:22-25).

Over the next few months, the new adjuster continued collecting records, including Austin's discovery responses detailing her injuries (*Id.* at 85:10-18), Austin's deposition (*Id.* at 95:21-22), and three doctor's reports (*Id.* at 123:22-124:1,

95:21-96:3). After considering the new information, the new adjuster updated his evaluation and recommended paying Austin the $100,000 policy limit she was demanding. (*Id.* at 96:12-97:10).

Austin agreed to accept the $100,000 to settle her underinsured motorist claim, in exchange for a release that preserved her bad faith claim. (*See* Doc. 44-15; *see also* Doc. 20, granting the parties' joint motion to dismiss the underinsured motorist claim).

After further discovery, Standard Fire moved for summary judgment on Austin's remaining bad faith claim (Doc. 44), and to exclude Austin's expert witness, Jim Leatzow (Doc 45). After the parties responded to Court-ordered supplemental briefing, Standard Fire also moved to strike the affidavit of Austin's psychologist. (Doc. 67). Austin responded to the Motion to Exclude (Doc. 50), and Standard Fire replied (Doc. 52). Austin also responded to the summary judgment motion (Doc. 55), and Standard Fire replied (Doc. 62).

## *Analysis*

### A. Motion to exclude

Standard Fire moves to exclude Austin's expert witness, Jim Leatzow. (Doc. 45). Motions to exclude are governed by Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

5

  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

  (b) the testimony is based on sufficient facts or data;

  (c) the testimony is the product of reliable principles and methods; and

  (d) the expert has reliably applied the principles and methods to the facts of the case.

The Sixth Circuit has interpreted Rule 702 to require three things for a proposed expert's opinion to be admissible. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). First, the witness must be qualified. *Id.* at 529. Second, the testimony must be relevant. *Id.* And third, the testimony must be reliable. *Id.* The party offering the expert testimony bears the burden of establishing its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993)).

Standard Fire takes issue with the first requirement, arguing that Leatzow is not qualified to testify about Austin's underinsured motorist claim. (Doc. 45 at 3). An expert may be qualified via "knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. Austin seeks to qualify Leatzow based on knowledge and experience, and of those two traits, the

6

parties focus primarily on experience. (*See* Doc. 45 at 4, Doc. 50 at 3).

When the qualifying trait is experience, "the nature and extent of that experience[]" determine whether the expert is qualified. *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012). "[T]he witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. The court may not simply "'tak[e] the expert's word for it.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." *Id.* (citing *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) (upholding exclusion of expert testimony because the expert's methodology was completely subjective)).

Here, Leatzow is the President and Founder of Leatzow & Associates, an insurance consulting firm. (Doc. 33-1). His resume indicates 47 years of experience in the property and casualty insurance industry. (*Id.*). During that time, he authored a national insurance program and was a licensed agent, broker, and producer in all 50 states. (Doc. 33-2 at 2-3). The program he authored included a claims handling manual and was approved nationwide,

including in Kentucky. (*Id.* at 3). He also personally adjusted the claims resulting from that program, and he has worked nationwide as a third-party administrator claims adjuster. (*Id.*).

Standard Fire argues that, while Leatzow does have experience, it's not the right type of experience. (Doc. 45 at 4). It points out that Leatzow has no formal training in claim handling, holds no claim handling designations, and has never handled the type of claim that Austin is disputing. (*Id.* at 2, 4). Austin counters that such criticism goes to weight, not admissibility, and that the proper remedy is vigorous cross examination and presentation of contrary evidence. (Doc. 50 at 2–5).

An examination of Leatzow's report reveals that he is qualified as an expert witness. Despite the fact that he has never personally handled an underinsured motorist claim, his report satisfies the requirements for an expert to qualify based on experience. The nature of his experience draws from every aspect of the insurance industry, including claims handling, and the extent of that experience is nearly half a century. *See Cunningham*, 679 F.3d at 379.

The report explains how his experience led to his conclusions. *See* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. It is through that experience that he became familiar with the insurance industry's customs and practices, which then

8

allowed him to determine whether Standard Fire's conduct comported with those customs and practices.

The report also explains why that experience is a sufficient basis for the opinion. *See id.* In the "Experience" section of the report, Leatzow writes:

> As an underwriting, coverage and claim handling expert, I have rendered opinions concerning various types of insurance coverages including property, casualty, general liability, auto insurance, marine, professional liability, excess liability and aviation insurance, as well as surplus lines coverages and coverage triggers.
>
> Having provided litigation support and consulting services to over 700 law firms and insurance companies since 2005, my retentions have been nearly equal at 55% plaintiff and 45% defense. With my training, licensure, experience, understanding, familiarity, on-going study and credentials, I am appropriately qualified to offer my opinions and testimony regarding the issues found in this dispute.

(Doc. 33-2 at 4).

Lastly, the report explains how Leatzow's experience is reliably applied to the facts of this case. *See* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. This case is about how an insurance company handled a claim, and Leatzow's report specifically details his experience in claims handling: he authored a national claims handling manual, adjusted claims stemming from the insurance program he created, and worked as a claims adjuster. (Doc. 33-2 at 3). Moreover, Leatzow's inquiry is not subjective or controversial. *See* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. It is based on national

9

standards and on the customs and practices of the insurance industry as a whole. (Doc. 33-2 at 2-3, 6).

Standard Fire's next argument is that Leatzow doesn't know the requirements to become a licensed claim handler in Kentucky, and has never handled any insurance policies or claims in Kentucky. (Doc. 45 at 4). But Standard Fire cites no law supporting the notion that an expert must have plied his trade in a particular state before offering an opinion about a case in that state. And the Court "is unaware of any rule requiring an expert to have experience in the relevant jurisdiction." *Wells v. GEICO Gen. Ins. Co.*, No. 5: 19-500-DCR, 2021 WL 3131316, at *12 (E.D. Ky. July 23, 2021).

Finally, Standard Fire argues that, even if the Court finds that Leatzow is qualified as an expert witness, it should nevertheless exclude certain portions of the opinion as inadmissible legal conclusions. (Doc. 45 at 4-5). There is a subtle but important difference between opining on the ultimate issue of liability, and stating opinions or factual information that suggest an answer to that question. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)).

The key to resolving that ambiguity lies in the words used by the expert witness. *See United States v. Ahmed*, 472 F.3d 427, 434 (6th Cir. 2006). If those words "'have a separate, distinct and

specialized meaning in the law different from that present in the vernacular,'" then the opinion is more likely to be a legal conclusion. *Id.* (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985)). In other words, courts generally exclude expert testimony "*only* when the witness explicitly testifies, in 'specialized' legal terminology, that a defendant violated (or did not violate) the law." *Babb*, 942 F.3d at 317 (citing *Kilion v. KeHE Distribs., LLC*, 761 F.3d 574, 593 (6th Cir. 2014)) (emphasis in original).

Here, a few parts of the second opinion in Leatzow's report contain specialized legal terminology constituting a legal conclusion. *See id.* First, the bold heading on page seven of the report—"Standard Fire violated the Kentucky Unfair Claims Settlement Practices Act"—is a legal conclusion. (Doc. 33-2 at 7). Second, the statement on page eight, "The treatment provided Ms. Austin by Shockling was not in good faith," is a legal conclusion. (*Id.*). And third, the statement on page eight, "This was bad faith claim handling[,]" is a legal conclusion. (*Id.*). Those three portions of Leatzow's report will be excluded.

### B. Motion for summary judgment

Standard Fire moves for summary judgment on Austin's remaining bad faith claim. (Doc. 33). Under federal law, summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. Id. However, "[t]he non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e)(2)).

Kentucky law recognizes four categories of insurance bad faith claims: (1) common-law third-party bad faith; (2) common-law first-party bad faith; (3) statutory bad faith under the Kentucky Consumer Protection Act; and (4) statutory bad faith under the Kentucky Unfair Claims Settlement Practices Act. *World Heritage Animal Genomic Res., Inc. v. Wright*, No. 22-5828, 2023 WL 3868646, at *1 (6th Cir. June 7, 2023) (first citing Ky. Rev. Stat.

12

§ 304.12-230; then citing *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526-27 (6th Cir. 2006)).

Austin's bad faith claim is statutory, brought under the Kentucky Unfair Claims Settlement Practices Act (the Act). (Doc. 1-1 at 6-7, Pl.'s Compl. ¶¶ 25-29). The Act seeks to protect the public by requiring insurers to act in good faith when dealing with insureds and third-party claimants. *Belt v. Cincinnati Ins. Co.*, 664 S.W.3d 524, 530-31 (Ky. 2022) (first citing *State Farm Mut. Auto. Ins. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988); then citing *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 26 (Ky. 2017); and then citing *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 820-21 (Ky. 1988)). It does so by prohibiting certain settlement practices. *Id.*; Ky. Rev. Stat. § 304.12-230.

At issue here are two of those prohibited practices, found in subsections (6) and (7) of the Act. (Doc. 1-1 at 6, Pl.'s Compl. ¶ 27). Subsection (6) prohibits "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]" Ky. Rev. Stat. § 304.12-230(6). And subsection (7) prohibits "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds[.]" *Id.* § 304.12-230(7).

13

Although the Act enumerates those and 15 other prohibited practices, those practices alone are merely "technical violations" of the Act. *Belt*, 664 S.W.3d at 531 (citing *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993)). Technical violations are mere contractual claims and do not rise to the level of bad faith. *Id.* (citing *Wittmer*, 864 S.W.2d at 890). Instead, a plaintiff bringing a bad faith claim must satisfy the three elements laid out by the Kentucky Supreme Court in *Wittmer v. Jones*:

(1) the insurer was obligated to pay the claim under the policy;

(2) the insurer lacked a reasonable factual or legal basis for denying the claim; and

(3) the insurer knew there was no reasonable basis for the denial or acted with reckless disregard for whether such a basis existed.

864 S.W.2d at 890 (quoting *Fed. Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 846-47 (Ky. 1986) (Leibson, J., dissenting), *overruled by Curry v. Firemen's Fund Ins. Co.*, 784 S.W.2d 176 (Ky. 1989)).

In addition, the *Wittmer* Court said that before a bad faith claim can exist in the first place, there must be evidence warranting punitive damages. *Id.* In other words, there must be evidence of bad faith, and that evidence must be "sufficient for the jury to conclude that there was 'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference

14

to the rights of others.'" *Id.* (quoting Restatement (Second) of Torts, § 909(2) (1979)). The court interpreted this language to require "sufficient evidence of intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury." *Id.*

Some (mostly federal) courts read that additional language as creating a "threshold standard" that must be met before the three *Wittmer* elements can even be examined. *Phelps v. State Farm. Mut. Auto. Ins. Co.*, 736 F.3d 697, 703 (6th Cir. 2012); *Wells v. GEICO Gen. Ins. Co.*, No. 5: 19-500-DCR, 2021 WL 3131316, at *13-14 (E.D. Ky. July 23, 2021); *Faith v. Great West Cas. Co.*, No. 3:20-cv-458-RGJ, 2022 WL 36923, at *2 (W.D. Ky. Jan. 4, 2022). The Sixth Circuit has noted the oddity of this approach since the threshold inquiry would depend on much of the same evidence as the second and third *Wittmer* elements. *See Phelps*, 736 F.3d at 703-04.

Other courts read the punitive damages language as comprising the substance of the third *Wittmer* element. *See, e.g.*, *Belt*, 664 S.W.3d at 535; *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 588 (Ky. 2021). This approach has been adopted by the most recent Kentucky Supreme Court cases addressing bad faith and is thus the current state of the law in Kentucky. *See Belt*, 664 S.W.3d at 535; *Mosley*, 626 S.W.3d at 588.

A federal district court sitting in diversity applies the substantive law of the forum state. *Castle v. 3M Co.*, No. 7:22-

CV-14-REW-CJS, 2023 WL 2663242, at *2 (E.D. Ky. March 28, 2023) (quoting *K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996)). Therefore, the Court will apply Kentucky substantive law and interpret *Wittmer*'s punitive damages language as comprising the third *Wittmer* element rather than as creating a threshold standard.

The parties take the other road, discussing the threshold standard before moving on to the *Wittmer* elements. (Doc. 44-1 at 12–14; Doc. 55 at 3, 7–10). But as noted above, the same evidence that would support the threshold inquiry also supports the second and third *Wittmer* elements, so the Court is confident that the parties have thoroughly briefed the question of bad faith.

### 1. Element 1 — Whether Standard Fire was obligated to pay the claim

The first element Austin must prove is whether Standard Fire was obligated to pay her claim. *Wittmer*, 864 S.W.2d at 890. An obligation to pay arises from a final judgment or settlement, or from an express contractual relationship. *Kim v. Ampler Burgers Ohio, LLC*, NO. 5:23-cv-00048-CHB-MAS, 2023 WL 4569577, at *2 (E.D. Ky. June 30, 2023) (first citing *United States Liab. Ins. Co. v. Watson*, 626 S.W.3d 569, 575 (Ky. 2021); then citing *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000)). In the latter case, "an *obligation to pay* requires proof that the insured's policy requires the insurer to pay, not that there is liability

16

under the contract, which is analyzed under *Wittmer*'s second requirement." *Mosley*, 626 S.W.3d at 585 (quoting *Hollaway v. Direct Gen. Ins. Co. of Miss.*, 497 S.W.3d 733, 738 (Ky. 2016)).

For example, an insurer might not be obligated to pay because language in the policy expressly excludes the type of claim at issue. *See, e.g.*, *id.*; *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 777 (E.D. Ky. 2019) (" . . . because the express terms of the policy and its attendant endorsement exclude the coverage at issue, Plaintiffs' claim fails as a matter of law . . .") (footnote omitted). Or a defendant might not be obligated to pay because it is an insurance agency or broker, not the insurer itself, and is thus not a party to the insurance contract. *See, e.g.*, *Griffin v. Middlefork Ins. Agency*, NO. 17-215-DLB, 2017 WL 4413403, at *4 (E.D. Ky. Oct. 4, 2017) (footnote and citations omitted).

Here, Standard Fire argues that it was not obligated to pay Austin's claim because the settlement agreement resolving that claim was not an admission of liability. (Doc. 44-1 at 15-16; Doc. 62 at 3-5). That agreement said that "the payment of the Settlement Consideration is not an admission of liability on the part of the Releasee, but is made solely in order to compromise a disputed claim for the purpose of avoiding further litigation." (Doc. 44-15 at 1). Standard Fire posits that this was a judicial admission

by Austin that liability was disputed, so Austin cannot prove a contractual obligation to pay the claim. (Doc. 62 at 5).

But as the above-quoted language from *Mosley* indicates, *liability* is addressed by the second *Wittmer* element, not the first. 626 S.W.3d at 585 (quoting *Hollaway*, 497 S.W.3d at 738). The first *Wittmer* element concerns only whether the policy itself contained coverage for the claim at issue, not whether that coverage has been triggered, or the degree of liability arising under it. *Id.* The question here, then, is simple: Did Austin's policy contain underinsured motorist coverage?

Yes. Section D1 of the policy, attached to Austin's Complaint, includes coverage for "Underinsured Motorists Bodily Injury." (Doc. 1-1 at 23). The policy contains no express language excluding underinsured motorists coverage, and Standard Fire was a party to the contract. *See Arnold*, 392 F. Supp. 3d at 777; *Griffin*, 2017 WL 4413403, at *4.

Therefore, there is a genuine dispute of fact as to whether an express contractual relationship existed between Austin and Standard Fire, and whether that contract obligated Standard Fire to pay Austin's claim. *See Kim*, 2023 WL 4569577, at *2. Austin has proffered sufficient evidence to satisfy the first *Wittmer* element.

### 2. Element 2 — Whether Standard Fire had a reasonable basis for denying the claim

18

The second *Wittmer* element is whether the insurer lacks a reasonable basis in law or fact for denying the claim. *Wittmer*, 864 S.W.2d at 890. To satisfy this element, a plaintiff must show that the insured's liability is beyond dispute. *Mosley*, 626 S.W.3d at 586 (citing *id.*). If liability is not beyond dispute, then a bad faith claim will fail as a matter of law. *Id.* (citing *Hollaway*, 497 S.W.3d at 739).

In *Hollaway v. Direct General Insurance Co. of Mississippi*, the Kentucky Supreme Court explained that there are two different forms of liability:

> Beginning with liability under the policy, we think it is important to clarify that realistically there are two distinct questions of law in assessing Direct General's duty to compensate Hollaway. First, and most obviously, is liability for the accident itself—whether the parking lot accident was a result of Direct General's insured's fault[]. . . . The second, and more important, dispute between Hollaway and Direct General is the extent and severity of her alleged injuries from the accident— liability Direct General has seriously contested from the outset.

497 S.W.3d at 738-39.

The parties here each focus on a different form of liability. Austin focuses on the first form, whether fault for the accident was disputed. She insists it was not, and so concludes that liability was beyond dispute. (Doc. 55 at 11). Standard Fire focuses on the second form, whether the nature and extent of Austin's injuries were disputed. (Doc. 44-1 at 15-16). It insists

they were, and so concludes that liability was *not* beyond dispute. (*Id.*).

Austin proffers sufficient evidence to create a genuine dispute of material fact about the first form of liability, fault for the accident. She posits that Standard Fire's own adjuster "admitted that she never discovered any question or issue as to liability." (Doc. 55 at 11). Austin points to the adjuster's liability analysis, which indicated that the other driver was "100 percent liable for going left of center and failure to yield. Also claimant suspected of OVI."[1] (Doc. 44-9, Shockling Dep. at 19:4–9). So the remaining question is whether there is a genuine dispute of material fact about whether the parties disputed the second form of liability, the nature and extent of Austin's injuries. *See Hollaway*, 497 S.W.3d at 739.

Standard Fire says no. It argues that "there was (and remains) a legitimate dispute about the nature and extent of Austin's claimed injuries and damages." (Doc. 44-1 at 15). When Austin first demanded the policy limits, the first adjuster reviewed the claim file, established a valuation range, and made an offer. (*Id.*). When a later adjuster obtained more information, he reviewed that information, reevaluated the claim, and made a new offer. (*Id.*).

---

[1] *OVI* is a synonym for DUI or DWI and refers to operating a motor vehicle while intoxicated or impaired. *See* Ky. Rev. Stat. § 189A.010. *Claimant* here refers to the other driver who caused the accident, not to Austin. (Doc. 44-9, Shockling Dep. at 19:10–20:1).

Therefore, Standard Fire argues, because the nature and extent of damages changed throughout the process, liability was never beyond dispute, so Standard Fire had the right to contest the claim. (*Id.* at 16).

But there was always a baseline degree of liability that was undisputed. Standard Fire's first settlement offer in June 2021 was for $12,500. (Doc. 44-5 at 78). Its own valuation of the case at that time was $20,000. (*Id.*). That $20,000 was the floor—both parties valued Austin's claim for at least that much. Austin may have wanted more, and Standard Fire may have wanted to pay less, but it was undisputed that Austin had at least $20,000 in damages. And yet, Standard Fire offered less than that undisputed value.

Viewing those facts most favorably to the nonmovant, as the Court is required to do on a motion for summary judgment, there is a genuine dispute of material fact as to whether the second form of liability—the nature and extent of damages—was disputed. Therefore, Austin has proffered sufficient evidence to satisfy the second *Wittmer* element.

### 3. Element 3 — Whether Standard Fire knew there was no reasonable basis for denial or acted with reckless disregard for whether such a basis existed

The third *Wittmer* element is whether "the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer*, 864 S.W.2d at 890. The plaintiff must show that the insurer's "conduct

21

was outrageous and caused the plaintiff actual damage." *Mosley*, 626 S.W.3d at 588 (first citing *Messer v. Universal Underwriters Ins. Co.*, 598 S.W.3d 578, 592 (Ky. Ct. App. 2019); then citing *Zurich Ins. Co. v. Mitchell*, 712 S.W.2d 340 (Ky. 1986)). Outrageous conduct is that which goes beyond negligence and justifies the imposition of punitive damages. *Id.* (citing *Wittmer*, 864 S.W.2d at 890).

In short, a plaintiff must show "intentional misconduct or reckless disregard of the rights of an insured or claimant to warrant submitting the right to award punitive damages to the jury." *Wittmer*, 864 S.W.2d at 890. Examples of such conduct include misrepresenting policy provisions, using the claimant's financial struggles as leverage, focusing the investigation on evading the claim, refusing to settle until the claimant releases the insurer from liability arising from its misconduct, "lowball" offers that barely exceed damages, extensive delay in settling or requesting records, refusing to disclose policy limits, and other troubling claims-handling practices. *Belt*, 664 S.W.3d at 535 (collecting cases); *Faith*, 2022 WL 36923, at *3.

Standard Fire argues there is no evidence that it engaged in any outrageous conduct warranting punitive damages. (Doc. 44-1 at 13-14). Specifically, it says that Austin conceded in her deposition that no one from Standard Fire lied to or deceived her or her mother during the claim investigation. (*Id.* at 13). It also

22

says Austin is unaware of any facts indicating that Standard Fire had an ulterior motive when it handled her claim. (*Id.*). Lastly, Standard Fire highlights the testimony of Austin's expert witness, who said there was nothing "malicious" about Standard Fire's handling of the claim. (*Id.* at 14).

Austin argues there were two instances of reckless disregard tantamount to outrageous conduct. First, Standard Fire failed to properly respond to her policy limits demand because the adjuster's "actual settlement authority" was capped at $50,000, well below Austin's $100,000 demand. (Doc. 55 at 7–8, 14–15). Despite that $50,000 cap, the adjuster kept Austin's claim for a protracted period of time, knowing all the while that she couldn't have settled it for the amount Austin demanded. (*Id.*).

The company's auto policy adjuster's guide said that an adjuster should inform a unit manager any time a policy limits demand was made. (*Id.*; Doc. 53-1, Shockling Dep. at 87:20–23). But according to Austin, the adjuster never talked to a supervisor about whether policy limits were appropriate, and never sought authority or approval to settle the claim for an amount higher than her $50,000 cap. (*Id.*).

Austin cites no case law showing that an adjuster who continues handling a claim despite knowing that the demand exceeds his or her settlement authority commits the sort of outrageous conduct that would warrant submitting punitive damages to a jury.

At most, Austin could argue that the adjuster's claim handling here delayed settlement.

But delay in settlement alone does not constitute bad faith conduct. *Belt*, 664 S.W.3d at 536 (quoting *Mosley*, 626 S.W.3d at 588-89). Instead, a plaintiff must show "'proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured [or claimant] with respect to the applicable coverage.'" *Id.* (quoting *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452-53 (Ky. 1997)). Austin doesn't show that.

The second instance of reckless disregard that Austin identifies is Standard Fire's offering "a significantly lower value to settle Plaintiff's claims, despite its own adjusters valuing the claim at significantly higher values." (Doc. 55 at 8). The Sixth Circuit has identified "lowball" offers that are "barely above" the claimant's damages as a factor that can support outrageous conduct. *Faith*, 2022 WL 36923, at *3 (quoting *Phelps*, 736 F.3d at 705-07).

For example, in *Phelps v. State Farm Mutual Automobile Insurance Co.*, the insurer valued the claim between $24,620 and $49,620. *Phelps*, 736 F.3d at 705. It offered the claimant $25,000 to settle. *Id.* The Sixth Circuit found that the insurer had not accounted for the claimant's pain and suffering or future wage loss and had offered no other explanation for the low offer. *Id.*

24

Whether that amounted to reckless disregard of the claimant's rights was a question for the jury. *Id.*

Here, Standard Fire made multiple settlement offers that were not just at the low end or "barely above" its own valuation, but were significantly below that valuation. In June 2021, Standard Fire valued Austin's claim at $20,000 and offered her $12,500 to settle. (Doc. 44-5 at 78). A month later, Standard Fire valued the claim at $35,000 and offered $20,000. (*Id.* at 94-95). Two more valuations followed, at $49,411 and $148,411. (*Id.* at 100-01, 107-08). But despite the increasing valuations, Standard Fire never updated its July 2021 offer of $20,000. (*Id.*).

Standard Fire offers three responses to Austin's lowball offer argument. First, it argues that Austin conceded that she is unaware of any evidence showing that Standard Fire's claims handling was motivated by ulterior motives. (Doc. 62 at 10). But Standard Fire cites no case law showing that a lowball offer must be accompanied by proof of an ulterior motive to support outrageous conduct under the third *Wittmer* element.

Second, Standard Fire argues that "discrepancies between reserves and settlement offers cannot be used to show bad faith under Kentucky law." (*Id.* at 10). But the discrepancies described above are not between the offer amount and the reserve amount. They are between the offer amount and the estimated settlement

value amount. (See *id.* at 78, 94-95, 100-01, 107-08). And those are two different things.

The *reserve* is a statutorily required estimate of total exposure. *Messer v. Universal Underwriters Ins. Co.*, 598 S.W.3d 578, 589 (Ky. Ct. App. 2019) (citations omitted). It includes things like coverage from the tortfeasor's carrier, and PIP coverage. (Doc. 44-5, Wong Dep. at 127:4-6). Essentially, a reserve is "what possibly could be the amount paid . . . what possibly could be owed on the entire claim, even if it's not supported yet." (*Id.* at 126:20-24). In contrast, the *estimated settlement value* is "the net settlement value, what's left over after the offsets and deductions are taken[.]" (*Id.* at 127:10-12).

Take for example Standard Fire's October 2021 valuation of Austin's claim. The estimated settlement value was $35,000. (*Id.* at 88). The reserve value—equal to the estimated settlement value *plus* "the 100,000 from the tortfeasor carrier and the 10,000 of PIP"—was $145,000. (*Id.* at 127:4-6).

Standard Fire is correct that disparities between the reserve amount and the offer amount may not support a bad faith claim. *Messer*, 598 S.W.3d at 589. But disparities between the estimated settlement value amount and the offer amount certainly can. *See Phelps*, 736 F.3d at 705. And Austin's argument is of the latter variety. (Doc. 55 at 9, 15).

Third, Standard Fire argues that "the totality of circumstances surrounding the investigation, evaluation and negotiation of the UIM claim do not yield any reasonable inference of bad faith." (Doc. 62 at 10). To support this argument, Standard Fire points to case law establishing that delay in payment alone is insufficient to support bad faith; there must instead be "proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." (*Id.*) (quoting *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670, 676-77 (E.D. Ky. 2010)).

By its own terms, that additional requirement applies when the challenged conduct is a delay in settlement. But the conduct Austin challenges here is not a delay, it's lowball offers: "Second, Defendant acted with reckless disregard as to Plaintiff's rights by continuing to offer a significantly lower value to settle Plaintiff's claims, despite its own adjusters valuing the claim at significantly higher values." (Doc. 55 at 8). And Standard Fire recognized that, noting that "[Austin] argues that such alleged 'lowballing' creates an inference of bad faith because the adjusters wanted to save the company money." (Doc. 62 at 9-10).

Nevertheless, Standard Fire tries to fit a square peg in a round hole. It uses case law dealing with one genre of misconduct—delays in settlement, which Austin isn't alleging—to address

27

another, entirely different genre of misconduct—lowball offers, which Austin *is* alleging.

How does it do that? By addressing an argument that Austin never made. It states, for example, "In the context of Austin's assertions of lowballing *and delay* . . ." Or, "Here, the undisputed facts do not give rise to any such reasonable inference that any *alleged delays* and alleged lowballing . . .") (Doc. 62 at 10–11) (emphasis added).

But Austin's argument as to the third *Wittmer* element rests on two specific allegations. Neither is delay in settlement. (Doc. 55 at 7–8). Standard Fire cannot pretend that Austin made an argument she never did just so it can shoehorn in a line of inapplicable cases that lead to its desired outcome.

Finally, a plaintiff bringing an insurance bad faith claim must show that the insurer's outrageous conduct caused her actual damage. *Mosley*, 626 S.W.3d at 588 (citations omitted). Standard Fire offers two reasons why Austin cannot satisfy *Wittmer*'s damage requirement.

First, it argues that Austin failed to plead any such damage. (Doc. 64 at 2). It points to the *Twombly-Iqbal* well-pleaded complaint standard and argues that Austin's Complaint does not allege any injuries stemming from Standard Fire's handling of her claim. (*Id.* at 3). But Austin counters that the well-pleaded complaint standard is just a jurisdictional test. (Doc. 65 at 3).

28

And here, Austin's Complaint requested "all amounts to which she is legally and properly entitled for the Defendant's violations of the [Act], including punitive or exemplary damages[.]" (Doc. 1-1, Pl.'s Compl. at 7).

Second, Standard Fire argues that, even if the Court construed Austin's pleadings to assert claims of actual damage, there is no evidence of such damage. (Doc. 64 at 4). Austin responds she suffered actual damage in the form of attorney's fees and litigation costs, and in the form of emotional distress, PTSD, stress, and anxiety. (Doc. 65 at 4–5).

There is sufficient evidence in the record to create a genuine dispute of fact for each of those damage categories. For attorney's fees and litigation costs, Austin provided an affidavit from a client account manager at her counsel's law firm indicating that she has incurred nearly $20,000 in costs and about 220 hours of billable time from her attorney. (Doc. 65-2).

For the damages associated with emotional distress, trauma, and anxiety, Austin points to her own deposition testimony and to the testimony and reports of medical experts. (Doc. 65 at 5–8). In her deposition, Austin references multiple times the stress and trauma she suffered from Standard Fire's handling of her claim. (Doc. 44-4, Austin Dep. at 14:17-22, 16:8-12, 17:21-24).

The reports from her medical experts also indicate trauma, anxiety, and PTSD, but the reports trace those conditions back to

the accident itself, not to Standard Fire's handling of Austin's insurance claim. (*See* Doc. 17-1, 18-1, 18-2). Nevertheless, Austin maintains that "[i]t is not an illogical leap to understand that *continued* and *protracted* litigation due to Defendant's bad faith can exacerbate those conditions." (Doc. 65 at 8). Regardless, Austin's deposition alone provides evidence in the record that Standard Fire's claims handling led to or exacerbated Austin's stress, trauma, and anxiety.

Therefore, construing the facts most favorably to the nonmovant, Austin has proffered sufficient evidence that Standard Fire made lowball offers, and sufficient evidence that she suffered actual damage. There is thus a genuine dispute of material fact as to whether Standard Fire engaged in outrageous conduct warranting punitive damages under the third *Wittmer* element.

### 4. Attorney's fees

The last issue the parties discuss is whether Austin may pursue attorney's fees. Ky. Rev. Stat. § 304.12-235(1) states that "[a]ll claims arising under the terms of any contract of insurance shall be paid to the named insured person or health care provider not more than thirty (30) days from the date upon which notice and proof of claim . . . are furnished the insurer." Subsection (3) states that if an insurer fails to so comply, then "the insured person or health care provider shall be entitled to be reimbursed for his reasonable attorney's fees incurred."

30

Here, Standard Fire makes two arguments as to why Austin cannot recover attorney's fees. First, it argues that Austin's Complaint doesn't seek them, and even if it did, she cites no statute authorizing attorney's fees in insurance bad faith cases. (Doc. 44-1 at 16–17; Doc. 62 at 11–12).

That argument fails. Austin's Complaint requested "all amounts to which she is legally and properly entitled for the Defendant's violations of the [Act], including punitive or exemplary damages[.]" (Doc. 1-1 , Pl.'s Compl. at 7). As described above, the statutory language of the Act contemplates attorney's fees, so the prayer for relief in the Complaint encompasses attorney's fees.

Second, Standard Fire argues that Austin cannot recover attorney's fees because the statutory language limits relief to the "named insured person," and the "named insured" on Austin's insurance policy was not her, it was her father. (Doc. 44-1 at 16–17; Doc. 62 at 12).

In support of that argument, Standard Fire cites *Nichols v. Zurich American Insurance Co.*, 630 S.W.3d 683, 693 (Ky. 2021). There, the plaintiff worked for a pipeline company, which had a commercial fleet policy with an insurance provider. *Nichols*, 630 S.W.3d at 685. The Kentucky Supreme Court held that the plaintiff was not entitled to attorney's fees because only his employer, the pipeline company, was a named insured under the policy. *Id.* at

693. The Court quoted its earlier decision in *Motorists Mutual Insurance Co. v. Glass*, concluding that the Act's "provision for attorney fees only applied 'to an insurer's negotiations with its own policyholder or the policyholder's health care provider.'" *Id.* (quoting *Glass*, 996 S.W.2d at 455).

Austin counters that while subsection (1) of § 304.12-235 mentions a "named insured person," subsection (3)—the section providing for attorney's fees—only mentions "the insured person." (Doc. 55 at 16). She also points out that while the insurance policy was held in her father's name, Austin was explicitly named in that policy as a driver. (*Id.* at 17).

The Court finds Austin's position more convincing. For one thing, the *Nichols* case is easily differentiated from Austin's. In *Nichols*, there was no indication that the plaintiff was named in the insurance policy at all. But here, Austin is specifically named. (Doc. 44-2 at 3). Moreover, the *Nichols* Court concluded the Act's attorney's fees provision only applied to an insurer's negotiations with its "policyholder." *Nichols*, 630 S.W.3d at 693 (quoting *Glass*, 996 S.W.2d at 455). Black's Law Dictionary says that, "[i]n most states, any person with an insurable interest may be a policyholder." (5th ed. 1979). Austin had an insurable interest here because she was an assigned driver on the policy.

Standard Fire's interpretation is also unworkable and would lead to odd outcomes. Take, for example, a situation like we have

32

here: a family of four with two parents and two children, all licensed drivers, all covered by the family insurance policy, but only the father is the "named insured" on the policy. Under Standard Fire's approach, only the father would be eligible to recover attorney's fees under the Act. Everyone in the family is covered on the same policy; any one of them could be in a car accident and make a claim; all are entitled to the benefits of Kentucky's Insurance Code. And yet, only the father—simply by virtue of having his name on the insurance bill—would reap the full benefits of being an insured driver.

That cannot be the case. It contradicts the Kentucky Supreme Court's admonition that the Act should be "liberally construed so as to effectuate its purpose." *Reeder*, 763 S.W.2d at 118 (first citing Ky. Rev. Stat. § 446.080; then citing *DeHart v. Gray, Ky.*, 245 S.W.2d 434 (1952)). Accordingly, Austin may recover attorney's fees under the Act.

### C. Motion to strike Peter Ganshirt's affidavit

Standard Fire's last pending motion is to strike the affidavit of Austin's psychologist, Peter Ganshirt. (Doc. 67). According to Standard Fire, Ganshirt's affidavit offers opinions on issues of causation, future treatment, or impairment. (*Id.* at 4). That makes him an expert witness. (*Id.*). Austin never identified Ganshirt in her expert witness disclosure, so she can't use those opinions now. (*Id.* at 4–5).

33

Austin uses Ganshirt's affidavit to show that she suffered emotional distress and trauma from Standard Fire's bad faith handling of her insurance claim. (Doc. 65 at 8-9). She does so in order to demonstrate actual damage, which is required under the *Wittmer* framework. *See, e.g.*, *Mosley*, 626 S.W.3d at 588 (citations omitted); *see also* Ky. Rev. Stat. § 446.070; *Glass*, 996 S.W.2d at 452 ("As required by KRS 446.070, a condition precedent to bringing a statutory bad faith action is that the claimant was damaged by reason of the violation of the statute.").

In her Response to the Court's Order for supplemental briefing on the issue of damages (Doc. 65), Austin offered sufficient proof, even without Ganshirt's affidavit, to create a genuine dispute of material fact about whether she suffered actual damage from Standard Fire's alleged bad faith. Because Austin can satisfy that burden with or without Ganshirt's affidavit, the motion to strike that affidavit is moot.

Therefore, it is hereby **ORDERED** that:

(1)  Standard Fire's motion for summary judgment, (Doc. 44), be, and is hereby, **DENIED**;

(2)  Standard Fire's Motion to Exclude, (Doc. 45), be, and is hereby, **GRANTED IN PART** and **DENIED IN PART**;

(3)  Standard Fire's motion to strike, (Doc. 67), be, and is hereby, **DENIED AS MOOT**.

This 10th day of August, 2023

34



**Signed By:**

*William O. Bertelsman* WOB

**United States District Judge**